IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| BROCK SHANK, individually and on behalf of a class of all persons and entities similarly situated, | Case No. 3:19-cv-136 |
| Plaintiff, | |
| vs. | CLASS ACTION COMPLAINT |
| GIVESURANCE INSURANCE SERVICES, INC., PROGRESSIVE CASUALTY INSURANCE COMPANY, and PROGRESSIVE WEST INSURANCE COMPANY, | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Preliminary Statement**

1. Plaintiff Brock Shank ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

2. Defendant Givesurance Insurance Services, Inc. made an automated telemarketing call on behalf of Defendants Progressive Casualty Insurance Company and Progressive West Insurance Company (collectively, "Progressive") to the Plaintiff's cellular telephone without his prior express consent, which is prohibited by the TCPA.

3. Because telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse,* the Plaintiff brings this action on behalf of a

proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendants.

4. A class action is the best means of obtaining redress for the Defendants' wide scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

### Parties

5. Plaintiff Brock Shank is an Ohio resident and a resident of this district.

6. Defendant Givesurance Insurance Services, Inc. ("Givesurance") is a California corporation with a principal place of business in Woodland Hills, California and a Registered Agent of Jennifer Rasiah, 22159 Cantlay Street, Canoga Park, California 91303.  Defendant engages in telemarketing into this district, as it did with the Plaintiff.

7. Defendant Progressive Casualty Insurance Company is an Ohio corporation with its principal place of business in Mayfield Village, Ohio.

8. Defendant Progressive West Insurance Company is an Ohio corporation with its principal place of business in Mayfield Village, Ohio.

### Jurisdiction & Venue

9. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiff's claims arise under federal law.

10. Defendants regularly engage in business in this district, including making telemarketing calls into this district and soliciting business from this district for insurance services.  Furthermore, Defendants provide Ohio residents with insurance services in this district.

11. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, as the telemarketing call to the Plaintiff occurred in this district.

## The Telephone Consumer Protection Act

12. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

**The TCPA Prohibits Automated Telemarketing Calls to Cellular Telephones**

13. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

14. In enacting the TCPA, Congress expressly found that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy[,] … consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers[,] … [e]vidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy[,] … [and that] [b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the

3

consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

15. In enacting the TCPA, Congress gave the Federal Communications Commission ("FCC") the power to prescribe regulations to implement the TCPA.

16. In 2013, the FCC prescribed a regulation requiring prior express written consent for all autodialed or prerecorded calls ("robocalls") that include or introduce an advertisement *or* that constitute telemarketing to wireless numbers. Specifically, it required:

> [A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.
>
> (i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:
>
> (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and
>
> (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

47 C.F.R. §§ 64.1200(a)(2) and (f)(8).

**The Growing Problem of Automated Calls**

17. When Congress enacted the TCPA in 1991, it found that telemarketers called more than 18 million Americans every day. 105 Stat. 2394 at § 2(3).

4

18. By 2003, telemarketers were calling 104 million Americans every day, abetted by the proliferation of new and more powerful autodialing technology. *In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14014, ¶¶ 2, 8 (2003).

19. Unfortunately, the problems Congress identified when it enacted the TCPA have grown only worse in recent years:

- "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." FCC Chairman Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016) (https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls).

- "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the TCPA of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2; FCC 16-57 (June 6, 2016) (https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf ).

- In 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. For every month in the fiscal year, robocalls made up the majority of consumer complaints about Do Not Call violations. *FTC Releases FY 2017 National Do Not Call Registry Data* (Dec. 18, 2017) (https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc).

- In May 2018, the New York Times reported extensively on the surging number of robocall complaints filed by consumers with the FTC and overall widespread consumer outrage as to the prevalence of illegal telemarketing despite existing law. *See* Tara Siegel Bernard*, Yes, It's Bad. Robocalls, and Their Scams, Are Surging* (May 6, 2018) (https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html).

- In April 2019, YouMail, Inc., a provider of cloud-based telecommunication services, calculated that Americans suffered an all-time high of 5.23 billion robocalls in March 2019, setting a new monthly record. This volume equaled 168.8 robocalls per day in March, and 1,953 robocalls per second. Keya Balar, *5.23 Billion Robocalls Set Record in March, According to YouMail Robocall Index* (Apr. 4, 2019) (https://www.prnewswire.com/news-releases/5-23-billion-robocalls-set-record-in-march-according-to-youmail-robocall-index-300824631.html).

**Givesurance's Telemarketing**

20.     Givesurance is a broker of insurance services that attempts to sell its client's services to the public.

21.     Givesurance uses telemarketing to promote Progressive's insurance products and services.

22.     Givesurance's telemarketing efforts include the use of automated calls to solicit potential customers.

23.     While such technology may save time and money for the Defendants' telemarketing efforts, it violates the privacy rights of the Plaintiff and putative class.

24.     Recipients of these calls, including Plaintiff, did not consent to receive them.

**Call to the Plaintiff**

25.     Plaintiff Shank is a "person" as defined by 47 U.S.C. § 153(39).

26.     Plaintiff's telephone number is (937) 694-XXXX, which is assigned to a cellular service.

27.     Givesurance placed a telemarketing call to Plaintiff's number on March 26, 2019.

28.     An automated text message then appeared on Plaintiff's cellular telephone:

> Please contact our office to save you money on you [sic] Progressive Trucking InsurancePolicy. Kindly call Givesurance 888-887-0818 or email Jennifer.rasiah@givesurance.org.

29.     The Caller ID for the text message was "555888."

30.     "555888" is an SMS short code, which is used for text message broadcasting to send out advertisements *en masse*.

6

31. The short code "555888" is registered in the U.S. Short Code Directory to SimpleTexting, which also advertises that SMS short code on its website, https://simpletexting.com (last visited Apr. 24, 2019).

32. SimpleTexting offers "mass text messaging," which SimpleTexting describes as a "communication service that lets an organization or business send a single text message to thousands of subscribers at the same time." *Id.*

33. Givesurance used SimpleTexting's "mass text messaging" service.

34. The foregoing facts, the impersonal content of the text messages, and the fact that these calls were part of a nationwide telemarketing campaign, demonstrate that the call was made using an automatic telephone dialing system ("ATDS" or "autodialer") as that term is defined in 47 U.S.C. § 227(a)(1).

35. Plaintiff did not respond to the text message. However, if he had, Givesurance would have proceeded to attempt to sell him a Progressive trucking insurance policy. Givesurance was not authorized to sell and did not sell any other company's trucking insurance policies, only Progressive's.

36. Plaintiff and the other call recipients were harmed by these calls. They were temporarily deprived of legitimate use of their phones because the phone line was tied up during the telemarketing calls and their privacy was improperly invaded. Moreover, these calls injured Plaintiff and the other call recipients because they were frustrating, obnoxious, annoying, were a nuisance, and disturbed the solitude of Plaintiff and the class.

### Progressive's Liability

37. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for

7

any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd. 12391, 12397, ¶ 13 (1995).

38. On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."[1]

39. In that ruling, the FCC instructed that sellers such as Progressive may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

May 2013 FCC Ruling, 28 FCC Rcd. at 6588, ¶ 37 (internal citations omitted).

40. The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id*. at 6586, ¶ 34.

41. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

---

[1] *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6574, ¶ 1 (2013) ("May 2013 FCC Ruling").

8

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information.  The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant.  It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts.  Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*Id*. at 6592, ¶ 46.

42. By authorizing and permitting their agents to promote Progressive insurance policies through telemarketing, Progressive "manifested assent to another person … that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency.

43. Moreover, Progressive maintained interim control over Givesurance's conduct.

44. Progressive's Marketing Manager visited Givesurance's office approximately every two months to meet with Givesurance regarding Givesurance's marketing for Progressive.

45. Progressive monitored Givesurance's practices, and Progressive's Marketing Manager would provide additional instructions and address any of Givesurance's deviations from Progressive's requirements and procedures at the periodic in-person visits.

46. Furthermore, Progressive had day-to-day control over Givesurance, including the ability to prohibit it from using an ATDS to contact potential customers of Progressive.

47. Givesurance had a user ID and password to login to Progressive's sales and/or customer system and the ability to enter customer information into Progressive's system.

48. Givesurance was authorized to access Progressive's system to prepare quotes using detailed proprietary information from Progressive.

49. Givesurance was further authorized to write Progressive insurance policies without the need for Progressive to have further involvement in closing the sale.

50. As such, Progressive granted Givesurance the power to bind Progressive in contract, a hallmark of agency.

## Class Action Statement

51. As authorized by Rule 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of all other persons or entities similarly situated throughout the United States.

52. The class of persons Plaintiff proposes to represent includes:

> All persons within the United States to whom: (a) Givesurance, and/or a third party acting on Givesurance's behalf, made one or more non-emergency telephone calls; (b) to their cellular telephone number; (c) using the telephone system(s) used in calling Plaintiff's cellular telephone number; and (d) at any time in the period that begins four years before the date of the filing of the original Complaint to trial.

53. Excluded from the class are the Defendants, any entities in which the Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of the judge's staff and immediate family.

54. The proposed class members are identifiable through phone records and phone number databases.

55. The potential class members number in the thousands, at least. Individual joinder of these persons is impracticable.

56. Plaintiff is a member of the proposed class.

10

57. There are questions of law and fact common to Plaintiff and to the proposed class, including but not limited to the following:

    a. Whether Givesurance used an ATDS to make the calls at issue;

    b. Whether Givesurance placed telemarketing calls without obtaining the recipients' valid prior express written consent;

    c. Whether Defendants' violations of the TCPA were negligent, willful, or knowing;

    d. Whether Progressive is vicariously liable for Givesurance's actions; and

    e. Whether the Plaintiff and the class members are entitled to statutory damages because of Givesurance's actions.

58. Plaintiff's claims are based on the same facts and legal theories as the claims of all class members and, therefore, are typical of the claims of class members, as the Plaintiff and class members all received telephone calls through the same automated telemarketing process.

59. Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the class, he will fairly and adequately protect the interests of the class, and he is represented by counsel skilled and experienced in class actions, including TCPA class actions.

60. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The only individual question concerns identification of class members, which will be ascertainable from records maintained by Givesurance and/or its agents.

61. The likelihood that individual class members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case, and given the small recoveries available through individual actions.

62. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

## Legal Claims

### Violation of the TCPA's Automated Call Provisions
### (On Behalf of Plaintiff and the Class)

63. The Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

64. The Defendants violated the TCPA by initiating telephone calls using an automatic telephone dialing system to telephone numbers assigned to a cellular telephone service without the prior express consent of the called party. *See* 47 C.F.R. § 64.1200(a)(1).

65. The Defendants violated the TCPA by initiating telephone calls that constitute telemarketing using an automatic telephone dialing system to telephone numbers assigned to a cellular telephone service without the prior express written consent of the called party. *See* 47 C.F.R. § 64.1200(a)(2).

66. As a result of the Defendants' violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the class presumptively are entitled to an award of $500 in damages for each and every call made to their cellular telephone numbers using an ATDS and/or artificial or prerecorded voice in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B). The Court may award up to $1,500 if the violation was found to be "knowing or willful." *Id.*

67. Plaintiff requests the Court to exercise its discretion and treble such damages for each willful or knowing violation.

68. Under the TCPA, the Plaintiff is entitled to injunctive relief. The Plaintiff seeks injunctive relief prohibiting Defendants from violating the TCPA, 47 U.S.C. § 227, by calling cellular telephone numbers using an automatic telephone dialing system.

## Relief Sought

For himself and all class members, Plaintiff requests the following relief:

A. Injunctive relief prohibiting Defendants from calling telephone numbers using an automatic telephone dialing system, absent an emergency;

B. Certification of the proposed class;

C. Appointment of Plaintiff as representative of the class;

D. Appointment of the undersigned counsel as counsel for the class;

E. A declaration that Defendants and/or their affiliates, agents, and/or other related entities' actions complained of herein violate the TCPA;

F. An award to Plaintiff and the class of damages, as allowed by law;

G. Leave to amend this Complaint to conform to the evidence presented at trial; and

H. Orders granting such other and further relief as the Court deems necessary, just, and proper.

**Plaintiff requests a jury trial as to all claims of the Amended Complaint so triable.**

Dated: February 11, 2020

PLAINTIFF,

BROCK SHANK
By his attorneys

**/s/ Brian K. Murphy**
Brian K. Murphy, Trial Attorney (0070654)
Jonathan P. Misny (0090673)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH  43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail:  murphy@mmmb.com
         misny@mmmb.com

Anthony I. Paronich (admitted *pro hac vice*)
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: 508.221.1510
E-mail: anthony@paronichlaw.com

14